# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TERRI A. GRIEVES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07 C 4404 |
| v. | ) | |
| | ) | Magistrate Judge Cole |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| Of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Terri Grieves seeks review of the final decision of the Commissioner of the Social Security Administration denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 423(d)(2); 1382c(a)(3). Ms. Grieves asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision denying Ms. Grieves' applications. For the reasons stated below, the Plaintiff's motion is granted, and the Commissioner's motion is denied.

## I.
### PROCEDURAL HISTORY

Ms. Grieves applied for DIB and SSI on October 4, 2005, alleging that she had been unable to work since August 25, 2005 due to degenerative disc disease. (Administrative Record ("R.") at 77, 102). Ms. Grieves also alleged depression and anxiety. (R. 51). The Social Security Administration ("SSA") denied her application both at the initial level (R. 39-42) and

1

upon reconsideration. (R. 45-48). The SSA received Ms. Grieves' timely request for a hearing before an Administrative Law Judge ("ALJ") on May 14, 2006. (R. 55). The ALJ conducted the hearing on January 18, 2007, at which Ms. Grieves, represented by counsel, testified. (R. 553-577). Edward Pagella, the vocational expert ("VE"), also testified. (R 571-575). In an opinion dated February 2, 2007, the ALJ found that although Ms. Grieves was not able to perform her past work as a secretary (R. 24), she was not disabled because she could perform other jobs such as an assembler, hand packager, or hand sorter (R. 24-25). This became the final decision of the Commissioner when the Appeals Council denied Ms. Grieves' request for review of the decision on June 8, 2007. (R. 4-6). *See* 20 C.F.R. §§ 416.1455; 416.1481. Ms. Grieves appealed the decision to the federal district court under 42 U.S.C. § 405(g), and the parties consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE

Ms. Grieves was born on July 25, 1967. (R. 559). She was thirty-nine years old at the time of the ALJ's decision. She is 5'4" and weighs between 155-160 pounds. (R. 559). Ms. Grieves left high school during her freshman year, but she completed her GED degree when she was twenty-five. (R. 560). She is able to read, write, and do basic arithmetic. (R. 560). Ms. Grieves is married with two adopted sons who are twelve and sixteen (R. 318, 565). Ms. Grieves primarily worked as a secretary for fifteen years until she was unable to continue working on August 25, 2005. (R. 560-61). She testified that she quit smoking six months prior to the hearing and she stopped consuming alcohol "a long time ago."[1] (R. 569).

---

[1] Ms. Grieves testified falsely that she quit smoking six months prior to the hearing and no longer drinks alcohol socially: at her emergency room visit on December 12, 2006, she admitted to smoking one pack a day and drinking socially. (R. 499-500).

# A.
# The Medical Evidence

## 1. Back Pain

Ms. Grieves claims that she is disabled as a result of her chronic back pain, depression, and anxiety. (R. 154). Ms. Grieves' back troubles date from December 10, 1996 when she saw an orthopedist for severe pain in her lower back. (R. 549). The MRI revealed a herniated disc on the L4-5 level and questionable impingement on left S1 nerve root at the L5/S1 level. (R. 549, 551). Ms. Grieves and her physician discussed the possibility of surgery, but she wanted to be treated conservatively. (R. 549). The physician noted that if the conservative treatment failed, then Ms. Grieves would need a laminectomy. (R. 549).

Ms. Grieves' back pain resurfaced in 2003, and she took a seven-month medical leave of absence from her job on June 3, 2003. (R. 352-353). Her primary care physician, Dr. Jones, reported tenderness in the lumbar paraspinal muscles, no weakness or sensory deficits, decreased range of motion in her back, and spasm in the lumbar paraspinal region. (R. 363). Dr. Jones also said that Ms. Grieves' depression and anxiety were also a cause of her medical leave. (R. 353). Ms. Grieves had a MRI on September 5, 2003, which showed a narrowing of the L3-4, 4-5, and 5-S1 disc spaces with mild adjacent spurring, which indicated degenerative disc disease. (R. 385). Dr. Jones permitted Ms. Grieves to return to work for four hours a day on September 29, 2003 (R. 358), and on October 6, 2003, authorized her to return to a full day of work. (R. 357). In conjunction with prescriptions for Vicodin[2] and Skelaxin[3] (R. 379), Dr. Jones prescribed Ms. Grieves an ergonomic chair (R. 356) and six sessions of physical therapy.[4] (R. 362).

---

[2] Vicodin is a brand name for hydrocodone. It is also marketed under the trade name, Norco. The record uses the three names interchangeably. It is a prescription pain killer, which may be habit-forming. Its side effects may include dizziness, light-headedness, nausea, sedation, vomiting. http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Vic1480.html&contentName=Vicodin&contentId=6 (last visited 7/2/08).

On October 14, 2004, Ms. Grieves visited the ER for a flare up of her back pain after pulling weeds. (R. 427). The symptoms were severe. (R. 427). She had tenderness to palpitation, and the pain radiated from her right buttock down her right leg. (R. 427-28). Numbness and tingling were present, but she maintained a normal gait. (R. 427-28). Ms. Grieves ambulated with assistance. (R. 431). The attending physician gave her morphine and Valium,[5] and discharged her with a prescription for Prednisone and Vicodin. (R. 428, 431). Ms. Grieves saw Dr. Jones the following day. (R. 375). She claimed that the ER had not given her any prescriptions, so Dr. Jones prescribed her Vicodin, Prednisone, and Valium. (R. 375).

Ms. Grieves returned to the ER on May 25, 2005 for her back pain, which again occurred from pulling weeds. (R. 420). Her symptoms were severe, she experienced pain upon range of motion, and she ambulated without assistance. (R. 420, 424). No numbness, tingling, or motor weakness was present. (R. 420). The ER physician diagnosed Ms. Grieves with low back pain, lumbago, and lumbar spasm. (R. 421). He gave her morphine and Valium, and prescribed her Motrin, Norco, and Valium. (R. 421, 423-24). Ms. Grieves saw Dr. Jones the following day who prescribed her Valium, Norco, and Prednisone. (R. 374). Dr. Jones re-filled these prescriptions

---

[3] Skelaxin is prescribed for the relief of painful musculoskeletal conditions. http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Ske1631.html&contentName=Skelaxin&contentId=529 (last visited July 2, 2008).

[4] No evidence exists in the record that Ms. Grieves completed Dr. Jones's prescription for physical therapy in 2003. However, she did complete a six-session course of physical therapy beginning on October 24, 2005 and ending on November 14, 2005. (R. 438-440).

[5] Valium is used for anxiety disorders and for short-term relief of the symptoms of anxiety. Side effects include anxiety, drowsiness, fatigue, light-headedness, loss of muscle coordination. http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Val1473.html&contentName=Valium&contentId=618 (last visited July 2, 2008).

because Ms. Grieves wanted to change pharmacies and was not able to pick up her ER prescriptions. (R. 374).

On August 22, 2005, Ms. Grieves visited the ER for a third time for her back pain caused by body motion, lifting, and overuse. (R. 413). The symptoms were moderate, but were exacerbated by movement and walking. (R. 413). She did not report any numbness or tingling. (R. 413). Range of motion was decreased and there was paraspinal tenderness. (R. 414). Ms. Grieves ambulated without assistance. (R. 417). The attending physician gave her morphine and wrote a prescription for Vicodin and Norflex. (R. 414). Ms. Grieves followed up with Dr. Jones on September 27, 2005 after her visit to the ER. (R. 373, 374). Dr. Jones ordered an MRI, which was taken on October 6, 2005 (R. 316). It revealed L3-4, L4-5, and L5-S1 disc degeneration and circumferential bulging. (R. 316). At the L4-5 level, there was a large, focal, central disc extrusion, which extended behind the L5 vertebral body and appeared to touch the origin of the right L5 nerve root. (R. 316). Because of these MRI findings, Dr. Jones referred Ms. Grieves to Dr. Draxinger, an orthopedist. (R. 316).

Ms. Grieves returned to the ER on October 12, 2005 for her low back pain. (R. 248). There was tenderness to palpation over the lower back. (R. 248). The physical examination revealed minimal pain distress. (R. 248). She said that her pain had worsened after prolonged sitting and Norco and Ibuprofen did not relieve her symptoms. (R. 248). The ER gave her Morphine and Flexeril which provided significant relief of her pain. (R. 248). She was discharged with a prescription for Flexeril and told to follow up with her orthopedist. (R. 248).

Dr. Draxinger saw Ms. Grieves on October 14, 2005. (R. 313). She complained of low back, leg, and hand pain. (R. 313). She reported that her back pain is getting "overly severe and she cannot really handle it anymore." (R. 313). Lying down made the pain better, but sitting and

walking made it worse. (R. 313). Dr. Draxinger noted that she could not walk on her toes or on her heels because of the pain. (R. 313). Very light palpation caused her a lot of pain. (R. 313). He examined her MRI and noted that there was severe degeneration of the L4-5 level with some endplate changes and disc bulging at the L3-4 and L5-S1 levels. (R. 313). Dr. Draxinger suggested that some of her pain was caused by muscle tightness, spasm, and "just agitation." (R. 313). He prescribed Norco, and suggested she wear her brace and ice her back. (R. 313). He mentioned the possibility of an epidural injection, and if nothing else worked, surgery would be the next option. (R. 313). He also advised her to quit smoking as it may affect her disc degeneration. (R. 313).

Ms. Grieves visited Dr. Jones on October 18, 2005 after her appointment with Dr. Draxinger. (R. 369, 373). Ms. Grieves reported to Dr. Jones that she was not happy with Dr. Draxinger's care and that he would not look at her MRI. (R. 369). Dr. Jones's notes reflect that that Dr. Draxinger stated that surgery was not an option. (R. 373). Ms. Grieves began her six-course physical therapy treatment on October 24, 2005. (R. 438). Ms. Grieves returned to see Dr. Jones on November 1, 2005 after two sessions of physical therapy, and stated that her pain level was unchanged. (R. 369, 372). Ms. Grieves completed her six sessions of physical therapy on November 14, 2005. (R. 438). After completion, the physical therapist noted that Ms. Grieves made limited progress and could not tolerate any exercise progression. (R. 438). Dr. Jones referred her to Dr. Franklin for possible epidural injections. (R. 372).

Dr. Jones completed the Agency's "Spinal Disorders" form on November 1, 2005 (R. 286-287). She diagnosed Ms. Grieves with chronic lower back pain, a herniated nucleus pulposus at L4-5, and degenerative disc disease at L3-4, L4-5, and L5-S1. (R. 286). She attested that driving, sitting, and standing aggravate Ms. Grieves' lower back pain. She noted tenderness

6

in the lumbar spine and paraspinal areas and off-and-on numbness in Ms. Grieves' feet. (R. 286). There were no sensory changes, evidence of nerve root compression, or atrophy (R. 286). Ms. Grieves had 5-/5 strength and her reflexes were 3+/2. (R. 286). Dr. Jones reported that Ms. Grieves' posture was slightly stooped, her gait was wide-based and slow, but not shuffling. (R. 286). Dr. Jones noted that Ms. Grieves could ambulate and did not need an assistive device. (R. 287-288) . Ms. Grieves' flexion of cervical spine was sixty degrees forward, fifty degrees lateral, with sixty degrees extension. (R. 286). Her flexion of the lumbar spine was seventy-five degrees forward, forty-five degrees lateral, with thirty degrees extension. (R. 286). Dr. Jones determined that Ms. Grieves could stand for fifteen to twenty minutes and walk for ten to fifteen minutes. (R. 287). She reported that Ms. Grieves could not carry or lift ten pounds and she would need to change position more than once every two hours (R. 287). According to Dr. Jones, Ms. Grieves could only sit for ten to fifteen minutes and would need to assume an alternate position every fifteen minutes (R. 287). She noted that physical therapy had slightly decreased the swelling in Ms. Grieves' back.

Ms. Grieves saw Dr. Franklin on November 16, 2005. (R. 310). She reported constant, sharp, and throbbing pain in her back that radiated down her legs. (R. 310). Ms. Grieves rated her pain at an eight out of ten. (R. 310). Dr. Franklin noted that she was ambulating without difficulty and there was no atrophy of the lower extremities. (R. 310). Her muscle strength was a 5-/5 in the lower limbs. (R. 311). Ms. Grieves' slump sit test on the right side did increase pain in her buttock and her right leg. (R. 311). Dr. Franklin reviewed her MRI and noted that she does have an L-4/L-5 disc protrusion that is slightly paracentral right and a small right paracentral disc protrusion at L-3/L-4. (R. 311). Dr. Franklin discussed Ms. Grieves' options,

including an epidural steroid injection. (R. 311). Ms. Grieves was uncertain if she wanted the epidural injection. (R. 311). He also prescribed her Lyrica.[6] (R. 311).

On November 16, 2005, the DDS medical consultant, Nenaber Michael, reviewed Ms. Grieves' records. (R. 288-295). He determined that Ms. Grieves could occasionally lift twenty pounds and frequently lift ten pounds. (R. 289). She could stand and/or walk with normal breaks for at least two hours in an eight-hour workday, sit with normal breaks for a total of six hours in an eight-hour workday, and her pushing and pulling ability was unlimited. (R. 289). He reported that Ms. Grieves could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. 290). Dr. Michael determined that Ms. Grieves had no manipulative, visual, communicative, or environmental limitations. (R. 291-292). He stated that his assessment was not significantly different from Dr. Jones's, Ms. Grieves' treating physician.[7] (R. 294).

On December 7, 2005, Ms. Grieves telephoned Dr. Franklin's office and stated that she wanted the epidural injection because the medication was not working. (R. 312). Ms. Grieves returned to Dr. Franklin's office on December 22, 2005. (R. 309). He noted that the Lyrica was ineffective. (R. 309). Her pain was an eight out of ten but was primarily in the lower back, but also radiated down her left leg. (R. 309). Ms. Greives went forward with the epidural injection. (R. 314-15). After the procedure, her pain remained an eight out of ten and she was able to ambulate without assistance. (R. 315). Dr. Franklin noted that Ms. Grieves seemed to have a very anxious demeanor and displayed classic pain behaviors. (R. 315).

---

[6] Lyrica is a prescription medication for nerve damage. The most common side effects are dizziness, blurry vision, weight gain, sleepiness, trouble concentrating, swelling of the hands and feet and dry mouth. United States Food and Drug Administration,
http://www.fda.gov/cder/drug/InfoSheets/patient/pregabalinPIS.htm (last visited July 2, 2008).

[7] The state evaluator erred when he stated his assessment was not significantly different from Dr. Jones's. *See* R. 286-287; Pl. Mem. at 20; Def. Mem at 6-7.

Dr. Jones completed a lumbar spine residual functional capacity questionnaire from Ms. Grieves' attorney on December 7, 2005 (R. 304-308). Dr. Jones diagnosed Ms. Grieves with chronic low back pain with a herniated nucleus pulposus and disc degeneration at L4-5 and L3-4. (R. 304). The findings included a MRI which revealed disc degeneration at L4-5 and L3-4, 5-/5 strength and a positive straight right leg test. (R. 304). Dr. Jones listed Ms. Grieves' symptoms, which included low back pain that radiated down both legs, numb feet, insomnia, fatigue, and anxiety. (R. 304). She characterized the pain as sharp and an eight on a one-to-ten scale. (R. 304). Dr. Jones stated that Ms. Grieves had no decreased range of motion. (R. 305). She listed Ms. Grieves as having a positive straight leg test, tenderness in her lumbar area, weight gain due to steroids, and impaired sleep. (R. 305).

Dr. Jones stated that emotional factors contribute to the severity of Ms. Grieves' symptoms and that Ms. Grieves' impairments are reasonably consistent with the symptoms and functional limitations listed in the questionnaire. (R. 305). She reported that Ms. Grieves' symptoms would frequently interfere with her attention and concentration to perform simple work tasks. (R. 305). She believed that Ms. Grieves' impairments would last more than twelve months. (R. 305). Dr. Jones also stated that, due to the medications, Ms. Grieves experienced fatigue, difficulty concentrating, and sleepiness. (R. 305). According to Dr. Jones, Ms. Grieves was not a malingerer. (R. 304).

Dr. Jones reported that Ms. Grieves could not walk one city block, she could sit for only fifteen minutes, stand for only fifteen minutes, and she could only sit or stand for about four hours in an eight-hour workday. (R. 306). Dr. Jones opined that Ms. Grieves would need to be able to walk around during an eight-hour work day, and she must do so every fifteen minutes for fifteen minutes. (R. 306). According to Dr. Jones, Ms. Grieves would need a job that allowed

9

her to shift positions at will and take unscheduled breaks every fifteen to twenty minutes for fifteen minutes. (R. 306). She reported that Ms. Grieves could occasionally carry ten pounds or less, rarely carry twenty pounds, and never carry fifty pounds. (R. 307). Dr. Jones listed that Ms. Grieves has no significant limitations in doing repetitive reaching and she can use her hands and fingers for grasping, turning, and twisting objects and fine manipulations one hundred percent of the time. (R. 307). Dr. Jones believed that Ms. Grieves' impairments would cause "good days" and "bad days" and she estimated that Ms. Grieves would be absent for more than four days per month. (R. 307).

Ms. Grieves returned to the ER on February 10, 2006 for her back pain. (R. 406). She stated that the pain was most severe in her lower back, but there was also pain in her legs. (R. 406). She reported her symptoms as moderate. (R. 406). Ms. Grieves rated her pain a ten out of ten. (R. 410). She ambulated with assistance. (R. 410). Her physical exam revealed decreased range of motion and significant pain from palpation to the lumbar spinous processes and lumbar paraspinal region. (R. 407). The attending physician gave her morphine and Valium, and prescribed her Prednisone in conjunction with her current medications of Norco and Valium. (R. 406-07).

Ms. Grieves returned to see Dr. Franklin on February 15, 2006. (R. 535). She was scheduled to see him the previous week, but because of her pain, she went to the ER. (R. 535). During her appointment with Dr. Franklin, her pain was an eight out of ten, a majority of which was in her back, with some in her legs. (R. 535). Upon physical examination, Dr. Franklin reported that Ms. Grieves ambulated without difficulty and there were no losses of balance. (R. 535). She had significant tenderness to palpation over the paraspinal muscles in her lower back. (R. 535). She had a negative slump sit test and there was no increased pain with simulated axial

10

rotation. Her muscle strength was 4+ to 5-/5 in her lower limbs. (R. 535). Dr. Franklin noted that the Lyrica was ineffective and the first epidural injection only provided a day and a half of relief. (R. 535). Ms. Grieves decided to try another injection. (R. 535). Ms. Grieves inquired about different medications, but Dr. Franklin did not want to increase her dose of Vicodin because she was already on a large dose. (R. 536). He stated that he believed that being on Vicodin for the long term was a losing battle for her. (R. 536). They discussed surgical options. (R. 536). He also suggested that a chronic pain program that focused on behavioral pain management might be a possibility for relief. (R. 536). Dr. Franklin gave her the epidural injection on February 16, 2006. (R. 532). She had another epidural injection on April 13, 2006. (R. 527).

On April 25, 2006, Ms. Grieves saw Dr. Jones because of her back pain and her ankle, which she injured by falling down the stairs. (R. 370, 371). On the same day, Ms. Grieves went to the ER because of her back pain and ankle injury. (R. 398). She stated that she saw Dr. Jones earlier, but that she could not do anything else for the pain. (R. 398). Ms. Grieves stated that Dr. Jones denied her any more pain medication, and she was therefore going to see Dr. Draxinger instead. (R. 398). The x-rays revealed that there was no fracture, and the attending physician diagnosed her injury as a sprain. (R.399-400). The attending physician spoke to Ms. Grieves about her narcotic use because she has been on Vicodin and Valium without improvement. (R. 399). He believed her complaints were legitimate and prescribed OxyContin.[8] (R. 399).

Ms. Grieves saw Dr. Draxinger on May 3, 2006. (R. 473). He noted that the epidural injections had been ineffective. (R. 473). Dr. Draxinger stated that "[s]he is essentially having troubles." (R. 473). He reported that taking two OxyContin per day was working well, so he

---

[8] OxyContin is a prescription painkiller used for moderate to high pain relief. It is an opiate derivative and its pharmacological effects include analgesia, sedation, euphoria, feelings of relaxation, respiratory depression, constipation, papillary constriction, and cough suppression. Abuse can lead to dependence and tolerance. It has been widely abused in the United States. United States Drug Enforcement Administration, http://www.justice.gov/dea/concern/oxycontin.html (last visited July 2, 2008).

decided to continue it, but to stop prescribing her Norco. (R. 473). The record shows that he continued to prescribe her OxyContin in June, July, August, and September. (R. 545-548).

On June 4, 2006, Ms. Grieves returned to the ER after being kicked in the chest after an altercation. (R. 390). Her x-ray was negative for any fracture or acute pathology. (R. 391). She did not report any back pain, and she ambulated without assistance. (R. 391-394). Ms. Grieves refused an offer of Tylenol and Motrin, and stated she would take her own pain medication at home. (R. 394).

Ms. Grieves returned to Dr. Draxinger's office on September 1, 2006 because she injured her foot after she fell down four steps from her patio. (R. 521). Dr. Draxinger took an x-ray of her foot, which revealed no fractures. (R. 521). He prescribed her OxyContin. (R. 521).

On November 1, 2006, Ms. Grieves saw Dr. Franklin because she fell and hurt her lower back. (R. 518). She reported that her pain was a ten out of ten. (R. 518). Muscle strength was 5/5 in her lower limbs and her reflexes were symmetric. (R. 518). Her sensation was intact except for some decreased sensation along the lateral aspect of her left leg and foot. (R. 518). Dr. Franklin ordered another MRI, but stated that she should see a spine surgeon to determine if surgery is warranted. (R. 518). Dr. Franklin recommended that Ms. Grieves enroll in a chronic pain program as Dr. Jones had prescribed, but Ms. Grieves said she was not able to get there. (R. 518). Dr. Franklin told her that he would not "chronically" prescribe OxyContin for her, and there was not much more he could do for her pain on that day. (R. 518). He recommended a chronic pain program and a surgical option. (R. 518).

Ms. Grieves had a MRI taken on November 6, 2006 following Dr. Franklin's suggestion (R. 540), which he reviewed on November 13, 2006. (R. 516-17). The MRI scan revealed that she has a broad-based right paracentral disc protrusion that abuts the L-4 nerve root with no

evidence of neural impingement. (R. 516). It showed left paracentral disk herniation and protrusion that likely abutted the L-5 nerve without definite impingement. (R. 516). There was mild foraminal stenosis on the right with no evidence of neural impingement. (R. 517). At Level L-5/S-1, there was a paracentral disc protrusion with no impingement at the left L-5 nerve root. (R. 517).

In Dr. Franklin's November 13, 2006 physical examination of Ms. Grieves, he noted that she could toe walk without significant difficulty, but grunted and groaned when she heel walked. (R. 516). She reported that she had normal sensation except on the back of her feet. (R. 516). Ms. Grieves had significant pain to light palpation over her lumbar paraspinal muscles. (R. 516). She had increased pain with simulated axial loading and a mild increase in pain with simulated axial rotation. (R. 516). Her muscle strength was 5-/5 and her reflexes were symmetric. (R. 516). Dr. Franklin provided two options for her that would most likely be her best chance for relief. (R. 516). First, he suggested that she obtain another opinion from a spine surgeon even though she stated that she has already seen two surgeons who said that surgery would not give her long-term relief. (R. 516). Second, he suggested that she enroll in a chronic pain program. (R. 516). Dr. Franklin said that he would not write any prescriptions of OxyContin for her since she had been on it a long time. (R. 516). He did not have any other treatments he would suggest for her. (R. 516).

Ms. Grieves returned to the ER on December 12, 2006 complaining of a lump in her right hip area, which was making walking difficult. (R. 499). The attending physician diagnosed her with an abscess on her right buttock, which he drained. (R. 499). Upon physical examination, there was no tenderness in her back to palpation and her motor and sensory exams were normal. (R. 500).

*2. Depression and Anxiety*

In conjunction with her chronic back pain, Ms. Grieves also alleges that she is disabled because of her depression and anxiety, which she claims began when she was a teenager. (R. 155). She claims that she has trouble concentrating, has lost interest in most activities, cannot sleep well, has decreased energy, and has feelings of guilt and worthlessness. (R. 155). Ms. Grieves maintains that her depression and anxiety have worsened in recent years because her back pain prevents her from doing the activities she once did, such as gardening, sewing, and playing with her children. (R. 117, 136). Ms. Grieves has never been under the care of a psychiatrist or other mental health professional. (R. 318). [9]

On December 7, 2005, Dr. Jones completed the Psychiatric Evaluation Form for Affective Disorders. (R. 297-303). She had treated Ms. Grieves for her psychiatric illnesses since May of 2003, sometimes monthly. (R. 298). Dr. Jones diagnosed Ms. Grieves with panic disorder, generalized anxiety disorder, and depression. (R. 298). She listed Ms. Grieves as displaying the following symptoms: pervasive loss of interest in almost all activities, sleep disturbances, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. (R. 299). Dr. Jones claimed that Ms. Grieves' psychiatric illnesses did not impair her daily living activities, her social functioning, or maintaining concentration, persistence, or pace. (R. 300-301). She never preformed any mental status examination or psychological tests of intelligence and memory that measured concentration. (R. 301). She indicated that stressful circumstances would exacerbate her signs and symptoms of her illnesses. (R. 301). Dr. Jones stated that Ms. Grieves had not experienced repeated episodes of decompensation or a history of chronic affective disorder of at least two years that has caused more than a minimal limitation on

---

[9] In addition to never seeing a mental healthcare professional, many of Ms. Grieves' medical records fail to show a consistent history of depressive symptoms. Ms. Grieves did not report her history of depression or anxiety to hospital personnel when seen for other complications. *See e.g.,* R. 224, 390, 399, 407, 500.

14

her ability to work. (R. 302). She stated that Ms. Grieves' mental condition was not expected to last at least twelve months at the current severity level. (R. 303). Dr. Jones also noted that Valium causes drowsiness. (R. 303).

At the request of the SSA, psychologist Dr. Mark Langgut examined Ms. Grieves on February 24, 2006. (R. 317-320). He initially observed that she was "friendly but anxious." (R. 317). He also noted that she walked slowly, seemed to be in pain and distress, and her gait was impaired. (R. 317, 318). She was alert and oriented. (R. 317). Her speech was "clear, direct, and relevant." (R. 317). Dr. Langgut listed her current medications of Valium, Zoloft, Hydrocodone, Prednisone, Ibuprofen, and Ranitidine,[10] and stated that they "impair her consciousness and result in some degree of mental confusion." (R. 318). The medications also inhibited her ability to drive. (R. 318). Ms. Grieves reported to Dr. Langgut that she does not use drugs and she denied any current or past use of alcohol.[11] Dr. Langgut described Ms. Grieves' account of her social functioning and stated that she rises at 6:00 o'clock in the morning with her family, but she has difficulty sleeping due to her anxiety and discomfort. (R. 318). He stated that Ms. Grieves was able to complete her daily living activities, but on a limited basis because of her back pain. (R. 318). He also reported that she took a long time to finish tasks and often needs the assistance of her husband and sons. (R. 318).

---

[10] Ranitidine is prescribed for heartburn.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601164.html (last visited July 2, 2008).

[11] Ms. Grieves' denial of alcohol use is clearly false. Throughout Ms. Grieves' medical records, a litany of evidence exists that she consumed alcohol socially. (*See e.g.*, R. 259-260, 313, 390, 399, 407, 414, 422, 428, 500). On February 10, 2006, two weeks prior to her visit with Dr. Langgut, Ms. Grieves visited the ER, which reported that she consumed alcohol socially. (R. 407). On her June 4, 2006 visit to the ER, Ms. Grieves specifically reported to the attending physician that she had a couple of alcoholic beverages that night (R. 303), and as recent as her December 12, 2006 ER visit, she reported consuming alcohol socially. (R. 500). This evidence belies her testimony to the ALJ that she stopped drinking a "long time ago, because of the medication." (R. 569).

15

In Dr. Langgut's psychological evaluation, he diagnosed Ms. Grieves with moderate major depressive disorder and panic disorder without agoraphobia (R. 320). Ms. Grieves reported to Dr. Langgut that her current depression level was a five to a six on a one-to-ten scale. (R. 319). He noted that her medications help limit her depression and that her depression is reactive to her pain. (R. 319). Her depressive symptoms include sleeping more, crying, feeling hopeless, lethargy, and irritability. (R. 319). Ms. Grieves told Dr. Langgut that her current anxiety level was a seven on a one-to-ten scale. (R. 319). Her symptoms included sensations of fear and dread and feelings of imminent death and heart attacks. (R. 319). He noted two occasions when she had to go to the hospital by ambulance because of her anxiety with panic. (R. 319). [12] Dr. Langgut noted that Ms. Grieves' emotions were consistent with her thoughts, her activity level was normal, and her behavioral abnormalities were consistent with her diagnoses. (R. 319). Dr. Langgut reported that she had intact memory skills and she had a high level of concrete thought. (R. 319). She may have difficulty forming generalizations and understanding concepts. (R. 319). Dr. Langgut reported that she was impulsive and had impaired judgment. (R. 319). He characterized her thought processes as slow, of average coherence, and normal flexibility and suggestibility. (R. 319). He also stated that "Ms. Grieves had impaired insight into her own situation." (R. 319). Dr. Langgut finally noted that she has "adequate judgment, responsibility, and arithmetic reasoning skills, as well as the ability to understand the effects of her actions." (R. 319).

On March 22, 2006, DDS non-examining reviewer, Dr. Linda Lanier, completed a Psychiatric Review Technique form. (R. 321-334). She assessed Ms. Grieves' mental condition under sections 12.04 for affective disorders (R. 324) and 12.06 for anxiety-related disorders (R. 326) of the Listing. Under section 12.04, Dr. Lanier reported that Ms. Grieves' depressive

---

[12] There is no evidence in the record of her hospital visits due to anxiety.

16

symptoms were sleep disturbances, decreased energy, and difficulty concentrating or thinking. (R. 324). Under section 12.06, she reported that Ms. Grieves' anxiety was characterized by recurrent severe panic attacks. (R. 326). Under the "B" Criteria of the Listings, Dr. Lanier assessed that Ms. Grieves had mild limitations on her restriction of her activities of daily living and in maintaining social functioning. (R. 331). She reported moderate difficulty in maintaining concentration, persistence, or pace. (R. 331). She noted one or two episodes of decompensation, each of extended duration. (R. 331). For both sections 12.04 and 12.06, Dr. Lanier determined that Ms. Grieves' mental condition does not establish the presence of the "C" criteria. (R. 332). In her consultant notes, Dr. Lanier stated that she does exhibit depression and anxiety, but her psychiatric condition does not impair her activities of daily living and her moods are probably not expected to last longer than twelve months. (R. 333). She noted that her activities of daily living were limited by her physical pain, but she did laundry, shopping, reads, cared for her children, played games, visited neighbors, used the telephone, and paid her bills. (R. 333). She also commented that the Valium caused drowsiness, the other medications cause forgetfulness, and driving is painful. (R. 333).

Dr. Lanier also completed a Mental Residual Capacity Assessment. (R. 335-338). She determined that Ms. Grieves' psychiatric condition did not limit her understanding or memory. (R. 335). She also determined that Ms. Grieves' concentration and persistence were not significantly limited, except that her ability to maintain attention for extended periods and to complete a normal workday and workweek without interruptions from psychologically-based symptoms were moderately limited. (R. 335-336). In Dr. Lanier's functional capacity assessment, she concluded that Ms. Grieves retained the ability to understand, remember, and

17

complete moderately complex instructions. (R. 337). Because of her anxiety problems, she would be better in a low-stress workplace, but she was still capable of SGA. (R. 337).

### B.

### The Plaintiff's Testimony

Ms. Grieves testified that she was unable to work because of her chronic back pain, depression, and anxiety. (R. 562). She claimed that her back pain is chronic and the pain ran from her buttocks upwards and traveled down her legs. (R. 563). Her toes and feet go numb often. (R. 563). She stated that she can only stand for about fifteen minutes, she cannot sit straight up anymore, and that she has to sit somewhat sideways. (R. 562, 565). She claimed that her pain is usually an eight on a scale from one to ten. (R. 570). Ms. Grieves testified that cannot perform household tasks such as cleaning and preparing most meals. (R. 567). She was able to bathe and dress herself, but she cannot take a bath anymore and a family member must be home when she showers in case she falls. (R. 569). She can barely drive anymore, but does accompany her husband shopping on occasion. (R. 569). She can no longer engage in her previous hobbies such as gardening, sewing, or craft-making. (R. 568). Ms. Grieves testified that she watches television, looks at magazines, or sleeps for most of the day. (R. 568-70). For her back pain, she takes ten milligrams of Oxycontin twice a day and Lyrica for nerve damage. (R. 564). Ms. Grieves testified that she has been treated for depression and anxiety since she was eighteen for which she takes Valium, Zoloft,[13] and Effexor[14] (R. 562, 565-66), but she has never

---

[13] Zoloft is prescribed for depression. Side effects may include Abdominal pain, agitation, anxiety, constipation, decreased sex drive, diarrhea or loose stools, difficulty with ejaculation, dizziness, dry mouth, fatigue, gas, headache, decreased appetite, increased sweating, indigestion, insomnia, nausea, nervousness, pain, rash, sleepiness, sore throat, tingling or pins and needles, tremor, vision problems, vomiting.
http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Zol1503.html&contentName=Zoloft&contentId=662 (last visited July 2, 2008).

been under the care of a psychiatrist. (R. 565-566). She testified that her depression has increased as a result of her back pain because she feels helpless and that she cannot take care of her family. (R. 566). Other current medications include Furosemide[15], Spironolactone,[16] and Albuterol.[17] (R. 154, 562-63).

## C.

### The Vocational Expert's Testimony

The Vocational Expert ("VE"), Edward Pagella, testified that Ms. Grieves was unable to perform her past work as a secretary or bank teller. (R. 572). In reaching this conclusion, the ALJ asked the VE the following hypothetical: he asked the VE to assume an individual born in 1967, who has a GED, and worked as a secretary and bank teller. (R. 571). He asked the VE to assume further that she was limited to lifting or carrying no more than ten pounds frequently and twenty pounds occasionally, restricted from climbing ladders, ropes, or scaffolds, and could only occasionally stoop or crouch. (R. 572). The ALJ also asked the VE to take into account that the individual was limited to simple, repetitive tasks because of problems maintaining attention and concentration due to psychiatric illnesses and the side effects of medications. (R. 572). The VE

---

[14] Effexor is used to treat depression. Side effects may include anxiety, blurred vision, constipation, dizziness, dry mouth, impotence, insomnia, nausea, nervousness, sleepiness, sweating, tremor, vomiting, weakness, weight loss.
http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Eff1153.html&contentName=Effexor&contentId=198 (last visited July 2, 2008).

[15] Furosemide is a diuretic. http://www.mayoclinic.com/health/drug-information/DR602525 (last visited July 2, 2008).

[16] Spironolactone is used to treat high blood pressure. http://www.mayoclinic.com/health/drug-information/DR602595 (last visited July 2, 2008).

[17] Albuteral is prescribed for the prevention and relief of bronchial spasms that narrow the airway.
http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=ALB1789.html&contentName=Albuterol+Sulfate&contentId=677 (last visited July 2, 2008).

stated that because she is relegated to simple, repetitive tasks, she would not be able to return to her past work. (R. 572).

The ALJ then asked the VE to further assume that the hypothetical individual would not be able to use acquired work skills in any other jobs. (R. 572). The VE testified that there were jobs that such a hypothetical individual could perform. (R. 572). He stated that such an individual could work as an assembler, hand packer, or hand sorter. (R. 572-573). In the geographical area, there are 4,800 jobs as an assembler, 3,600 jobs as a hand packer, and 1,800 jobs as a hand sorter. (R. 572-573). He testified that these jobs exist in LaSalle, Peru, and the Chicago metropolitan area (R. 572), and that they would exist in similar numbers across the country. (R. 573-574).

The ALJ then added additional restrictions. First, he asked the VE to assume that the hypothetical individual could only stand or walk for no more than one third of the workday. (R. 573). The VE's response was unchanged. (R. 573). Second, he asked the VE to consider the same individual, but she would have to change positions from sitting to standing as often as every thirty to forty-five minutes. (R. 573). The VE's response remained unchanged. (R. 573). He stated that his testimony was consistent with the United States Department of Labor's data, *The Dictionary of Occupational Titles*, and *The Selected Characteristics of Occupations*. (R. 574).

The claimant's attorney cross-examined the VE, adding the additional criterion that the hypothetical individual would experience frequent interruptions in her ability to concentrate, distracting her from her task more than twenty percent of the time. (R. 574). With this addition to the hypothetical, the VE testified that she would not be suitable for substantial gainful activity ("SGA"). (R. 574). He stated that for an individual to be capable of SGA, she would need to be

20

on task a minimum of eighty-four percent of the time. (R. 574). The attorney proceeded to ask the VE if an individual would be capable of SGA if she were to miss more than four days of work a month. (R. 574). The VE responded that to be capable of SGA, an individual can only miss one and three-quarters days of work a month. (R. 575).

## IV.
## THE ADMINISTRATIVE LAW JUDGE'S DECISION

The ALJ held that Ms. Grieves was not disabled under the Social Security Act because even with her impairments, she is capable of performing a significant number of jobs in the national economy. (R. 25). The ALJ analyzed the case using the five-step sequential analysis under 20 C.F.R. § 404.1520 and 20 C.F.R. 416.920. (R. 15-16). The ALJ found that Ms. Grieves satisfied the first step because she had not engaged in substantial gainful activity since the alleged onset date of August 25, 2005. (R. 16). At the second step, the ALJ found that Ms. Grieves has severe impairments, in particular, degenerative disc disease, hypertension, anxiety, and depression. (R. 16).

At the third step of the sequential analysis, the ALJ found that Ms. Grieves did not have an impairment or combination of impairments that met the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17). First, the ALJ reviewed the requirements of Listing 1.04 (disorders of the spine). (R. 17). Although Ms. Grieves' MRI revealed degenerative disc disease at L3-4, L4-5, and L5-S1, he stated that the degree of severity was not sufficient to meet the requirements of the Listing. (R. 17). The ALJ further stated that Ms. Grieves could ambulate effectively as defined by 1.00B2b. (R. 17). He cited evidence from Dr. Franklin, Ms. Grieves' orthopedist, that she was ambulating without difficulty, she had no loss of balance, and her range of motion was within functional limits. (R. 17).

Second, the ALJ discussed Ms. Grieves' testimony that she has experienced hypertension for the eight to nine months prior to the hearing. (R. 17). The ALJ found that the medical record failed to show any impairment that equaled the requirements of Listing 4.00 (cardiovascular system) and that Ms. Grieves testified that her medication controls her hypertension. (R. 17).

Third, the ALJ determined that the medical record showed that Ms. Grieves' diagnosed depression and anxiety met the "A" criteria of Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders). (R. 17). The ALJ then evaluated whether her psychological illnesses met the "B" criteria of the Listings, which are ability to handle activities of daily living, function in a social setting, maintain concentration, persistence and pace, and whether there have been repeated episodes of decompensation. (R. 17). The ALJ determined that Ms. Grieves' psychiatric illness does not meet the requirements of the "B" criteria. (R.17). She was only mildly limited in her ability to handle activities of daily living and maintain social functioning. (R. 17). Ms. Grieves is able to see her children off to school, make lunch, watch television, read, care for herself, and occasionally accompany her husband shopping. (R. 17-18). However, she does not do household chores or drive anymore as a result of the medications. (R. 17-18).

The ALJ stated that Ms. Grieves shows a moderate degree of limitation regarding her ability to maintain concentration, persistence, and pace. (R. 18). He cited Dr. Jones's December 7, 2005 assessment that Ms. Grieves had difficulty concentrating, but her limitation was not due to psychiatric illness. (R. 18). The ALJ noted that there was no evidence of any episodes of decompensation. (R.18). The ALJ also found that Ms. Grieves' psychiatric condition does not meet the requirements of the "C" criteria because the record did not reveal any evidence of decompensation or an inability to function outside of a highly supportive living arrangement as described by section 12.04C. (R. 18).

22

At the fourth step, the ALJ found that Ms. Grieves has a residual functional capacity to perform work that requires her to lift or carry up to ten pounds frequently and twenty pounds occasionally, and stand or walk less than one-third of an eight hour workday. (R. 18). He noted that the work should not require the use of ladders, ropes, or scaffolds, it should be limited to only occasional stooping or crouching, and it should require only simple, repetitive tasks. (R. 18). In making this determination, the ALJ followed the two-step process based on 20 C.F.R. 404.1529 and 416.929 and SSRs 96-4p and 96-7p. After reviewing the record, the ALJ determined that there was an underlying medically determinable impairment, which could produce the alleged symptoms, but that Ms. Grieves was not credible. (R. 19-22).

In making the credibility determination, the ALJ surveyed the record and recited the factors listed in SSR 96-7p. (R. 19-23). First, the ALJ concluded that despite her physical and mental health problems, Ms. Grieves is able to engage in a "relatively active lifestyle." (R. 22). In making this determination, he relied on evidence that Ms. Grieves sees her children off to school, occasionally accompanies her husband shopping, watches television, and reads. (R. 23). He also noted that she takes care of herself, but she cannot take a tub bath. (R. 23). He stated that although Ms. Grieves testified that she does not do laundry, Dr. Franklin noted on November 13, 2006 that she injured herself doing laundry. (R. 23). The ALJ considered this information conflicting, which cast doubt upon her credibility. (R. 23). The ALJ then concluded that the ability to perform these activities shows that Ms. Grieves can sit, stand, and walk. (R. 23). The ALJ then reasoned that because Ms. Grieves can visit with her in-laws, watch her children, watch television, read, play cards or games, talk to neighbors, talk on the telephone, and pay bills, she is able to maintain concentration. (R. 23).

The ALJ found Ms. Grieves not credible because Dr. Franklin noted in his records that were additional options for treatment such as a chronic pain program and surgery.[18] (R. 23). Ms. Grieves never pursued a chronic pain program. (R. 23). Despite Ms. Grieves' statement to Dr. Franklin that she had seen two spine surgeons who told her surgery was not an option, the ALJ found it compelling that the record did not support her assertion. (R. 23).

The ALJ then adopted the opinion of the state agency evaluators over Dr. Jones's opinion that Ms. Grieves was able to perform light work, requiring lifting or carrying ten pounds frequently and twenty pounds occasionally and walking or standing from two to six hours a day. (R. 23). He concluded that this opinion was consistent with his (R. 23) – an odd observation since it seemed to invert the analysis required by Social Security regulations. That is, medical testimony is not to be credited because it conforms to the ALJ's opinion; rather, the ALJ's opinion is a function of the medical testimony.

The ALJ did not give controlling weight to Dr. Jones's opinion that Ms. Grieves was only able to sit, stand, or walk for four hours a day, that she required a fifteen minute break everyone fifteen to twenty minutes, and that she would be absent from work more than four days a month. (R. 23). In making this conclusion, the ALJ cited evidence from Dr. Franklin's records that Ms. Grieves ambulated without difficulty, had no loss of balance, and her range of motion was within functional limits. (R. 23). He also considered that Ms. Grieves' daily activities were not consistent with Dr. Jones's opinion. (R. 23).

At the fifth step, the ALJ determined that jobs existed in the national economy that Ms. Grieves can perform even though she cannot return to her past work. (R. 23, 24). Relying on the VE's testimony at the hearing, the ALJ concluded that although Ms. Grieves cannot perform a

---

[18] In the ALJ's opinion, it is unclear whether Ms. Grieves' failure to pursue additional treatment options supported his determination that she was not credible or his decision not to give controlling weight to her treating physician.

full range of light work, jobs such as an assembler, hand packager, and hard sorter were still available to her. (R. 25).

**V.**
**DISCUSSION**

**A.**
**Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one: a court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997). Substantial evidence is more than a scintilla and something less than a preponderance. *See Schmidt v. Astrue,* 496 F.3d 841- 42 (7th Cir. 2007); *Flynn v. Astrue,* 2008 WL 2588066 (N.D.Ill. July 1, 2008).

The court may not reweigh the evidence or substitute its judgment for that of the Social Security Administration. Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Binion,* 108 F.3d at 782; *Flynn,* 2008 WL 2588066 at *6.

While judicial review is very deferential, *Elder v. Astrue,* 2008 WL 2406256 *4 (7th Cir. 2008); *Wilder v. Chater,* 64 F.3d 335, 337 (7th Cir.1995), it is a careful and informed review nonetheless. Rubber stamping the Commissioner's decision is forbidden. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir.2002). In order for the court to affirm a denial of benefits, the ALJ must have articulated the reasons for his decision at some minimal level. *Rice v. Barnhart,* 384 F.3d

363, 371 (7th Cir.2004); *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott,* 297 F.3d at 595.

## B.
## The Required Five-Step Sequential Analysis

Social Security Regulations require a five-step sequential inquiry by the ALJ to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351-52 (7th Cir.2005). *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir.2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. § 416.920; *Briscoe,* 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir.1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. § 404.1520; *Stein,* 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe,* 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir.1997).

## C.
## Analysis

Ms. Grieves advances three arguments for the reversal of the ALJ's decision. First, Ms. Grieves argues that the ALJ's credibility analysis failed to follow the requirements of SSR 96-7p. (Pl. Mem. at 22-25). Second, she contends that ALJ failed to properly consider the evidence from Ms. Grieves' treating physician, Dr. Jones when making his RFC assessment. (Pl. Mem. at 19-22). Lastly, she asserts that substantial evidence did not support the ALJ's five-step conclusion because he omitted Plaintiff's mental restrictions from the hypothetical posed to the VE. (Pl. Mem. at 25-26).

## 1.
## The ALJ Failed to Make a Properly Supported Credibility Determination

Ms. Grieves contends that the ALJ erred in his credibility determination because he did not adequately consider her subjective complaints of pain after she established a medically determinable impairment that could be expected to produce the pain. (R. 23). If a claimant reports subjective complaints of pain, the ALJ must consider factors such as the claimant's daily activities, nature and intensity of the pain, precipitating and aggravating factors, dosage and side effects of medication, treatment for relief of pain, and functional limitations. SSR 96-7p; *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *Scheck v Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). Generally, a reviewing court will afford an ALJ's credibility determination "special deference" and will only reverse it if it was "'patently wrong.'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

The standard is highly deferential because the ALJ has direct access to the claimant and experience with the types of cases under review. *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004) (Posner, J.). *Compare Ashcraft v. Tennessee*, 322 U.S. 143, 171 (1944) (Jackson, J.

dissenting) ("a few minutes observation of the parties in the courtroom is more informing that reams of cold record."). When the ALJ determines the claimant is not credible based on "'objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision.'" *Clifford*, 227 F.3d at 872.

In this case, in making his credibility determination, the ALJ only briefly addressed two factors: Ms. Grieves' daily activities and her failure to pursue additional treatment options.[19] First, the ALJ concluded Ms. Grieves' daily activities showed that she was capable of substantial gainful activity. When assessing a claimant's daily activities, an ALJ must "consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days a week." "Minimal daily activities...do not establish that a person is capable of engaging in substantial physical activity." *Carradine*, 360 F.3d at 755. *See also Clifford*, 227 F.3d at 872; *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (ALJ's "casual equating of household work to work in the labor market cannot stand"); *Vertigan v. Halter*, 260 F.3d 1044 (9th Cir. 2001) ("mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility"). In short, "disability" under the Social Security regulations is not synonymous with functional incapacity.

The applicant in *Clifford*, 227 F.3d at 872, could perform tasks such as performing household chores with breaks, preparing simple meals, occasionally shopping for groceries,

---

[19] In the ALJ's opinion, it is unclear whether Ms. Grieves' failure to pursue additional treatment options supported his determination that she was not credible or his decision not to give controlling weight to her treating physician. Both the Plaintiff's and Commissioner's briefs also treat this factor as support for his determination not to give controlling weight to her treating physician because of the organization of the opinion. Although it is organizationally the natural reading, logically it is not. For that reason, this discussion treats the ALJ's assessment of her failure to pursue other treatment options as part of his credibility determination.

playing cards, and babysitting her grandchildren. The Seventh Circuit found that these minimal daily activities did not establish that she could engage in substantial gainful activity because the plaintiff had to take frequent breaks, and the activities hurt her back and did not consume the entire day. *Id.* Because the claimant's testimony did not contradict her claim of disabling pain, the Seventh Circuit remanded the case to the ALJ to reevaluate her claims of pain in conjunction with the full range of medical evidence. *Id.*

Just as in *Clifford*, Ms. Grieves' activities do not establish that she is capable of substantial gainful activity because the ALJ never discussed if her activities were transferrable to the workplace. Despite the ALJ's finding that Ms. Grieves leads a "relatively active lifestyle despite her health problems" (R. 22), Ms. Grieves' "relatively active lifestyle" only included helping her teenage children get off to school, occasionally accompanying her husband shopping, watching television off and on all day, periodically reading, playing cards in ten-fifteen minute increments, and independently taking care of herself, except for her inability to take a tub bath. (R. 23). The ALJ simply stated summarily that "these activities indicate that the claimant is able to maintain concentration to some extent and interact with others." (R. 23). While the ALJ listed the activities as evidence, he did not provide any reasoning as to why those very limited activities can translate into Ms. Grieves' ability to work an eight hour day five days a week given that she takes frequent breaks and the activities are painful to her.

In fact, the ALJ ignored the medical evidence and Ms. Grieves' testimony that she can only perform the activities with frequent breaks and on a limited scale. Common sense dictates that performing chores at home allows for flexibility and breaks that the workplace does not. *Gentle*, 430 F.3d at 867. Where "'medical evidence supports the claimant's allegations and the ALJ nevertheless rejects a claimant's testimony as not credible, the ALJ cannot merely ignore the

claimant's allegations, and must articulate specific reasons for his finding.'" *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). While it is not this court's role to reweigh evidence, *Herron*, 19 F.3d at 333, "an ALJ may not ignore an entire line of evidence that is contrary to her findings, rather she must articulate at some minimal level analysis of the evidence to permit an informed review." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001)(internal citations and quotations omitted). In this case, the ALJ ignored Ms. Grieves' allegations without articulating specific reasons for doing so. He failed to address what weight he gave to her testimony that she was only able to play games for ten to fifteen minutes at a time (R. 23), that she could not finish a chapter in a book (R. 568), and that she was unable to sweep, vacuum, sew, garden, or drive (R. 567-568). If this aspect of her testimony is to be credited, the ALJ's conclusion is plainly incorrect. Yet, the ALJ did not reject this part of the testimony or explain why it was not credible.

The ALJ also failed to discuss what effect her pain medications have on her ability to sustain these activities over prolonged periods of time. Because a strong narcotic such as OxyContin and other medications such as Valium can significantly affect a person's ability to work, the ALJ should have figured their effects into his disability determination. *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *Porch v. Chater*, 115 F.3d 567 (8th Cir. 1997); *Williams v. Astrue*, 2008 WL 222683 (N.D.Fla. 2008); SSR 96-7p. *Cf. Sullivan v. Zebley*, 493 U.S. 521, 540 (1990).

Although the ALJ discussed the side effects of Ms. Grieves medications in his recitation of the facts (R. 17-18, 19-20) and stated that he considered them (R. 22, 572), the ALJ failed to build a "logical bridge" because he never analyzed how the side effects factored into his ultimate conclusion. Because multiple doctors such as Dr. Jones (R. 305) and Dr. Langgut (R. 317)

discussed how the medications impaired her functioning, the ALJ could not simply ignore a line of evidence without properly discussing it. *Zurawski*, 245 F.3d at 888.

The only specific reason for the ALJ's opinion that Ms. Grieves was not credible regarding the amount of limitation she said she experiences (R. 23) is the fact that she testified at the February hearing that she can no longer do laundry (R. 567), while medical records indicated that she hurt herself doing laundry on November 13, 2006. (R. 516). But, this was two months before the hearing. Hence, her claim of present inability to do laundry is perfectly consistent with her testimony that months earlier she had injured herself while doing laundry and that as a consequence, she no longer could perform that chore. In short, this is one of those rare cases in which a credibility determination can be disturbed by a reviewing court, since the ALJ grounded his credibility finding in an observation or argument that is unreasonable or unsupported. *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006).

Second, the ALJ supported his credibility finding on the fact that Ms. Grieves failed to pursue two specific treatment options: 1) seeking another opinion regarding back surgery and 2) partaking in a chronic pain program. (R. 23). The Social Security regulations explain that while following a prescribed course of treatment can bolster a claimant's credibility, the "adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain...[a claimant's] failure to seek medical treatment." SSR 96-7p. *See also Ribudaudo v. Barnhart*, 458

F.3d 580, 585 (7th Cir. 2006). (ALJ's credibility determination rejected in part because ALJ did not consider claimant's explanation for his failure to take prescription medications). [20]

The regulations further provide that while the claimant has the responsibility of proving disability, the ALJ has the duty to develop a full and fair record. SSR 96-7p. *See also Thompson v. Sullivan*, 933 F.3d 581, 585 (7th Cir. 1991); *Rogers v. Barnhart*, 446 F.Supp.2d at 834. By failing to ask the simple question of why the claimant could not pursue the medical treatment, the ALJ did not satisfy his obligation to fully develop the record. *Cf. Smith v. Apfel*, 231 F.3d 433, 437-38 (7th Cir. 2000) (rejecting ALJ's conclusion regarding the extent of claimant's arthritis when he had failed to order recent x-rays even though claimant bears the burden of proving disability).

In this case, the ALJ not only drew unsupported inferences about Ms. Grieves' failure to seek another surgical opinion or pursue a pain clinic, but he also failed to develop the record as to why she did not pursue the additional options. The ALJ stated that Ms. Grieves was not credible because the record did not confirm that she had seen two spine surgeons who told her surgery was not an option. (R. 23). While it is true that it is difficult to pinpoint the evidence in the record to support Ms. Grieves' statements to Dr. Franklin that she had seen two surgeons (R. 516), it was impermissible for the ALJ to draw a credibility conclusion without making an effort to obtain or identify those records.

The ALJ did ask Ms. Grieves if she had ever had surgery, and she stated that she had not. (R. 563). She elaborated that the first time she saw a spinal surgeon was when she first started to have problems, and they discussed surgery, but decided to treat her back conservatively at the time. (R. 563). The record corroborated Ms. Grieves story regarding the first spinal surgeon.

---

[20] Where that explanation is not credible, not only does it not detract from the ALJ's determination, it can bolster it and affect the overall credibility of the claimant. *See Rogers v. Barnhart*, 446 F.Supp.2d 828, 834 (N.D.Ill. 2006); *Lukaneva v. Levy Restaurants*, 2006 WL 1823169 at n. 11 (N.D.Ill. 2006).

*See* R. 549. It was also clear from the record that Ms. Grieves and Dr. Draxinger discussed the possibility of surgery when she saw him on October 14, 2005. (R. 313). He stated that they would try more physical therapy, wear a brace, and an epidural spinal injection, and if those options did not work, then they would operate. (R. 313). While it was unclear if these were the physicians Ms. Grieves was referring to when she saw Dr. Franklin, the ALJ had a responsibility to determine if they were. If they were not, he had a duty under the SSR 96-7p to question the claimant about the physicians because he based his credibility finding on them.

That the ALJ's reasoning that Ms. Grieves was not credible based on her statements to Dr. Franklin was flawed, does not mean that his ultimate conclusion was. There is evidence in the record that supports the ALJ's conclusion that her statements to Dr. Franklin were not completely honest. First, neither opinion regarding surgery ruled out the possibility. In fact, both discussed how it might be necessary. Second, Ms. Grieves saw Dr. Jones four days after she saw Dr. Draxinger (R. 369, 373). She told Dr. Jones that Dr. Draxinger told her that there was no surgical option. This is inconsistent with Dr. Draxinger's records. (R. 313). Third, Ms. Grieves was not completely forthright with Dr. Franklin because she saw the first surgeon ten years prior to her visit with Dr. Franklin when her back pain was not as severe. (R. 549). She also failed to tell him that both surgeons never ruled out the possibility of surgery but had actually considered it a strong possibility if other treatments were ineffective. (R. 313, 549). But these are questions for the ALJ on remand.

The ALJ also drew unsupported inferences and failed to develop the record regarding Ms. Grieves' failure to enroll in a pain clinic. He partially based his credibility finding on the lack of evidence in the record that she never pursued a chronic pain program, but he never asked Ms. Grieves at the hearing why she did not follow Dr. Franklin's advice. The ALJ did more than

33

simply not credit Ms. Grieves' explanation; he never offered her a chance to explain. Dr. Franklin's notes also indicate that Ms. Grieves told him that Dr. Jones had tried to refer her to a pain management clinic, but "she could not get there." (R. 518). While it was unclear from the record why Ms. Grieves could never get to the pain management clinic, the ALJ should have inquired why because he based his finding on her failure to pursue the program. Moreover, although the ALJ partially based his credibility finding on Ms. Grieves' failure to pursue specific treatment options, he never addressed what weight he gave to the treatments Ms. Grieves did pursue, such as multiple ER and doctor visits, epidural injections, and pain medications. There is no evidence that any of these attempts to deal with her situation was viewed by any medical professional as contrived.

Ms. Grieves argues that the ALJ improperly relied on Dr. Franklin's November 13, 2006 chronic pain program recommendation because it was the last piece of medical evidence submitted to the record before the hearing and there was no way to know what treatment Ms. Grieves sought between Dr. Franklin's recommendation and the hearing. Pl. Reply at 7. This argument is unpersuasive for two reasons. First, the record indicates that both Dr. Franklin and Dr. Jones had recommended a chronic pain program well before the hearing.[21] Second, the ALJ never states that he relied on the November 13, 2006 medical records, but he could have been relying on Dr. Franklin's February recommendation, which was a year before the hearing.

Citing to *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004), the Commissioner claims that this court must affirm the ALJ's decision because he gave specific reasons for his credibility finding despite not discussing every factor listed in SSR 96-7p. (Def. Mem. at 9-10). In *Skarbek*, the Seventh Circuit affirmed the ALJ's credibility finding because he found that

---

[21] Dr. Franklin had initially recommended it on had also suggested referring Ms. Grieves to a pain management clinic on February 15, 2006 (R. 535) and on November 1, 2006 (R. 518). Dr. Jones had recommended a pain management clinic on September 3, 2003 (R. 379), January 21, 2004 (R. 378), and October 15, 2004. (R. 375).

Skarbek's testimony was not consistent with the medical evidence and his daily activities indicated he was not disabled. 390 F.3d at 505. While the court in *Skarbek* did not require the ALJ to discuss every factor, the ALJ's reasoning in *Skarbek* is distinguishable from the ALJ's in this case. While the ALJ in *Skarbek* only discussed two factors, his reasoning behind the two factors was adequate because he provided specific reasons for his credibility finding that were supported by the record. *Id.* While an ALJ need not discuss every factor, his reasoning behind the factors he does address must be reasonable and contain record support. *Id.* In this case, the ALJ's reasoning behind his credibility finding was both unreasonable (his discussion of daily activities) and unsupported (his discussion of claimant's failure to pursue recommended treatment options).

The Commissioner also contends that the ALJ considered the objective medical evidence and the side effects of the Ms. Grieves' medications in his credibility determination. (Def. Mem. at 10-11). While the ALJ summarized the medical record, he did not provide any reasoning in his opinion as to the weight he gave this evidence. An "ALJ must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872; *See also Green v. Shalala*, 51 F. 3d 96, 100-01 (7th Cir. 1995); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Cline v. Sullivan*, 939 F.2d 560, 563-69 (8th Cir. 1991). The reasons for an ALJ's credibility finding cannot be implied, and "he must *specify* the reasons for his finding." *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) (emphasis in original). The ALJ must be the one who specifies the reasons, not the Commissioner's lawyers. *Id.* The lawyers' "effort to pinpoint parts of the ALJ's decision that support the credibility finding is unhelpful." *Id.* To undertake a meaningful review, the ALJ must make clear to any subsequent reviewers the

weight the he gave to the claimant's statements and medical evidence and the reasons for that weight. *Zurawski*, 245 F.3d at 887; SSR 96-7p.

The Commissioner argues that the ALJ considered the diagnostic evidence, clinical findings, and side effects of Ms. Grieves' medications in his determination that Ms. Grieves' testimony did not coincide with the medical evidence. (Def. Mem. at 10-11). While the Commissioner does cite to the ALJ's opinion, he cites to his recitation of the facts, not to his reasoning. (Def. Mem. at 10). While the ALJ summarized the medical record, including the diagnostic and clinical evidence, he did not analyze which evidence conflicted with Ms. Grieves' testimony and why that evidence did not coincide with her complaints. The ALJ noted that Ms. Grieves experiences "dizziness, nausea, tiredness, and decreased memory" as a result of her medications, but he never discussed what weight he gave to that testimony and why he did not take the side effects of the medicine into consideration regarding her RFC. (R. 19). Because it is improper to imply (or supply) the ALJ's reasoning, this court cannot meaningfully review the ALJ's credibility finding, despite the Commissioner's attempt to provide guidance of his decision.

### 2.
### The ALJ Improperly Discounted The Treating Physician's Opinion Making His RFC Assessment

Ms. Grieves argues that the ALJ made an improper RFC assessment because he provided insufficient reasons for discounting her treating physician's opinion. Dr. Jones, the treating physician, opined that Ms. Grieves could only sit, stand, or walk for only fifteen minutes at a time, for no longer than four hours in an eight hour day. (R. 306). She stated that Ms. Grieves would need fifteen minute breaks every fifteen minutes. (R. 306). She could occasionally lift ten pounds and rarely lift twenty pounds. (R. 307). Dr. Jones reported that Ms. Grieves' pain would

frequently interfere with her attention and concentration. (R. 305). Dr. Jones did not believe that Ms. Grieves had any limitations with repetitive reaching, handling or fingering. (R. 307). Dr. Jones estimated that Ms. Grieves would be absent from work more than four days per month. (R. 307). Dr. Jones's opinion was consistent with a finding for disability because if a claimant needs to frequently alternate between sitting and standing, she is not capable of light work that requires prolonged standing or sitting. *See* SSR 83-12. Moreover, the VE testified that to be capable of SGA, a claimant may only miss one and three-quarter days of work per month. (R. 575).

Of course, Ms. Grieves is not entitled to benefits merely because her treating physician said that she is disabled or unable to work. *Dixon,* 270 F.3d at 1177. While Social Security regulations textually suggest that controlling weight is to be given to treating medical opinions, SSR 96-2p; 20 C.F.R. § 404.1527(d)(2); see *Scheck,* 357 F.3d at 702, the rule is not to be inflexibly applied. Quite the contrary, the rule directs the administrative law judge to give controlling weight to the medical opinion of a treating physician if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence." *Id.*

Although the rule has been "around for a long time" and cited in enumerable cases, is not a rule of automatic application in favor of plaintiffs, as shown by Judge Posner's opinion for a unanimous panel in *Hofslien v. Barnhart,* 439 F.3d 375 (7th Cir. 2006) -- which itself was a case in which the ALJ properly rejected the testimony of the treating physician. The court pointed out the "uncertain[ty]" of the rule's meaning and utility. *Id.* at 376. Indeed, the court stressed that the time for re-examination of the rule by the Social Security Administration was at hand. It is worth

quoting the court's assessment of the Rule, since it bears significantly on the plaintiff's

interpretation and misapplication of the rule:

> Obviously if [the opinion of the treating physician] is well supported and there is
> no contradictory evidence, there is no basis on which the administrative law
> judge, who is not a physician, could refuse to accept it. Equally obviously, once
> well-supported contradicting evidence is introduced, the treating physician's
> evidence is no longer entitled to controlling weight.

> Where does that leave the administrative law judge? There are two possibilities.
> One is that, by analogy to presumptions that disappear when evidence in
> opposition to the presumed fact is introduced ("bursting bubble" presumptions,
> [citations omitted], the rule drops out and the treating physician's evidence is just
> one more piece of evidence for the administrative law judge to weigh. Another
> possibility is that his evidence retains a tiebreaker role: if the treating physician's
> evidence and the contrary evidence are in equipoise, his view prevails. The first
> seems the more plausible interpretation, as well as being more consistent with the
> case law; we have found no cases that adopt the equipoise interpretation.

> The rule goes on to list various factors that the administrative law judge should
> consider, such as how often the treating physician has examined the claimant,
> whether the physician is a specialist in the condition claimed to be disabling, and
> so forth. The checklist is designed to help the administrative law judge decide
> how much weight to give the treating physician's evidence. When he has decided
> how much weight to give it, there seems no room for him to attach a presumptive
> weight to it.

> The advantage that a treating physician has over other physicians whose reports
> might figure in a disability case is that he has spent more time with the claimant.
> The other physicians whose reports or other evidence are presented to the
> administrative law judge might never even have examined the claimant (that was
> true here), but instead have based their evidence solely on a review of hospital or
> other medical records. But the fact that the claimant is the treating physician's
> patient also detracts from the weight of that physician's testimony, since, as is
> well known, many physicians (including those most likely to attract patients who
> are thinking of seeking disability benefits, [citations omitted] will often bend over
> backwards to assist a patient in obtaining benefits. [citations omitted].

> So the weight properly to be given to testimony or other evidence of a treating
> physician depends on circumstances.

*Hofslien,* 439 F.3d at 376-377. *See also Zeigler Coal Co. v. Office of Workers' Compensation*

*Programs,* 490 F.3d 609, 616 (7th Cir. 2007)("We 'have disapproved any mechanical rule that

the views of a treating physician prevail.'... '[T]he treating physician's views may not be accepted unless there is a good reason to believe that they are accurate.' "); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir.2001) ("a claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work").

While a treating physician may have spent more time with the claimant and thus have advantages over other physicians whose analysis lacks that intimacy and proximity, the fact that the claimant is the treating physician's patient also detracts from the weight of that physician's testimony. " '[A]s is well known, many physicians (including those most likely to attract patients who are thinking of seeking disability benefits) will often bend over backwards to assist a patient in obtaining benefits,' and therefore 'the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances.'" *Schmidt,* 496 F .3d at 842.

An ALJ's responsibility is not reflexively to credit a treating physician's testimony but to weigh that evidence along with all the other evidence and make judgments as to what evidence is most persuasive. *See generally Farrell v Sullivan,* 878 F.2d 985, 989 (7th Cir. 1989) (An administrative law judge is not required or indeed permitted to accept medical evidence if it is refuted by other evidence – which need not itself be medical in nature. *Wilder,* 64 F.3d at 337. *See also Stormo v. Barnhart,* 377 F.3d 801, 805-06 (8th Cir.2004) (opinions of treating physicians are not controlling if they are inconsistent with the record as a whole); *Reed v. Barnhart,* 399 F.3d 917, 920-21 (8th Cir.2005). Indeed, the Seventh Circuit has made clear that decisive medical opinion contrary to that of a treating physician can even come from physicians "who had not treated or even examined" the claimant. *Hofslien,* 439 F.3d at 376.

The ALJ did not grant controlling weight to Dr. Jones's opinion because in his view it was not "supported by the evidence." Instead, he based his conclusion on the state evaluator's

opinion[22] (R. 23), which permitted light work. (R. 23).[23] Although not required to accept the opinion of a treating physician, an ALJ must minimally articulate his reasons for discounting it, *Elder v. Astrue*, 2008 WL 2406256, at *6 (7th Cir. 2008); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007), and in doing so "may not ignore an entire line of evidence contrary to [his] findings." *Zurawski*, 245 F.3d at 888. *See also Clifford*, 227 F.3d at 874 (ALJ must assess evidence that supports the contrary conclusion to allow for meaningful review).

In this case, the ALJ did not afford Dr. Jones's opinion controlling weight for two reasons. First, Dr. Franklin, Ms. Grieves' orthopedist, reported that during his physical examination of Ms. Grieves she could ambulate without difficulty, had no loss of balance, and her range of motion was within functional limits. (R. 23). While the ALJ very minimally articulated his reasoning for discounting Dr. Jones's opinion, he only discussed evidence that supported his ultimate conclusion. He failed to discuss any of Dr. Franklin's reports that supported Dr. Jones's opinion.

For example, The ALJ discussed how Dr. Franklin noted that her range of motion at her bilateral hips, knees, and ankles was within functional limits, but not that her lumbar range of motion was decreased. (R. 535). He also failed to discuss that she had significant tenderness to

---

[22] Plaintiff points out in her brief that the state evaluator checked the box that his opinion did not significantly differ with the treating physician, when in fact it did. As the Commissioner argues, it was harmless error for the ALJ not to discuss his mistake. Simply because the state evaluator checked this box, Plaintiff is incorrect to presume that he agreed with all of Dr. Jones's assessment, including that Ms. Grieves was disabled. For example, Dr. Jones opined that Ms. Grieves would need to alternate positions about every fifteen minutes. (R. 287). However, the state evaluator did not check the box that stated that Ms. Grieves would need to periodically alternate between sitting and standing. (R. 289).

[23] Plaintiff argues that the state evaluator's assessment was inconsistent with the definition of light work. (Pl. Mem. at 20). However, his evaluation coincided with the Rules and Regulations' definition of light work. Although the form the evaluator completes is confusing in its organization, the evaluator stated that Ms. Grieves could stand for at least two hours and could sit for less than six hours. Light work usually requires either approximately six hours of standing or sitting in an eight hour day. 20 C.F.R. §§ 404.1567(b); 416.967(b); SSR 83-10. While the form does not make it clear exactly how long the evaluator believed Ms. Grieves could sit or stand, the findings were not inconsistent with the definition of light work.

palpation. (R. 535). During another visit, Dr. Franklin stated that she displays "some classic pain behaviors." (R. 539). When Ms. Grieves visited Dr. Franklin a few months before the hearing, she could toe walk without significant difficulty, but she had to grab on to the side of the table when she heel walked. (R. 516). Lastly, he did not discuss how much weight he gave to the MRI findings, the multiple ER reports, the physical therapist's records, or Dr. Draxinger's findings, all of which were consistent with and supportive of Dr. Jones's opinion.

Second, the ALJ discounted Dr. Jones's opinion because, in his view, Ms. Grieves' daily activities were not consistent with it. (R. 23). He based his conclusion on Ms. Grieves' statements to Dr. Franklin that she hurt herself while doing laundry, which the ALJ concluded conflicted with her testimony that she did not do laundry anymore. (R. 23). This conclusion is not supportable. It was precisely because she had hurt herself doing laundry in November 2006 that she would say at the hearing in early 2007 that she could no longer do laundry. More importantly, the ALJ ignored the myriad limitations on Ms. Grieves' daily activities that were completely consistent with Dr. Jones's opinion.

While it is not a court's role to reweigh the evidence, the ALJ must at least minimally address some of the factors that are contrary to his conclusion in order to make an informed review of his decision. The ALJ in this case simply discounted Dr. Jones's opinion without addressing any of the evidence that supported it.

Finally, the ALJ adopted the opinion of the state agency evaluators over Dr. Jones's opinion that Ms. Grieves was able to perform light work, requiring lifting or carrying ten pounds frequently and twenty pounds occasionally and walking or standing from two to six hours a day. (R. 23). He concluded that this opinion was consistent with his (R. 23) – an odd observation since it seemed to invert the analysis required by Social Security regulations. That is, medical

testimony is not to be credited because it conforms to the ALJ's opinion; rather, the ALJ's opinion is a function of the medical testimony. An ALJ is not qualified to play doctor and interpret medical evidence. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); *Dixon*, 270 F.3d at 1177.

### 3.
### The ALJ Did Not Omit Plaintiff's Mental Limitations
### From His Hypothetical To The VE[24]

Ms. Grieves argues that the ALJ's hypothetical question to the VE was flawed because he translated her mental limitations into an ability to do simple repetitive tasks. In his hypothetical, the ALJ told the VE to assume that "because of problems maintaining attention and concentration....[Ms. Grieves] would be limited to relatively simple, repetitive tasks." (R. 572). While the ALJ could have better phrased the question, it was not error to relegate Ms. Grieves to simple, repetitive tasks due to her concentration and attention problems. *See Heller v. Barnhart*, 2005 WL 643360, at **1 (7th Cir. 2005) ("there is nothing to suggest that an employee who has trouble concentrating could not work at the type of unskilled repetitive jobs the vocational expert identified."). By definition, a RFC is "an assessment of what work-related activities an individual can perform despite her limitations." *Dixon*, 270 F.3d at 1178. The ALJ has the job of determining a claimant's RFC if he finds that the claimant has a severe mental impairment that does not meet the severity required by the Listing. 20 C.F.R §§ 404.1520a(d)(3), 416.920a(d)(3).

Unlike other aspects of the ALJ's opinion, he discussed and evaluated the evidence related to Ms. Grieves' mental condition. Substantial evidence supported his RFC determination regarding her mental limitations. Both Dr. Lanier (the Agency evaluator) and Dr. Jones agreed that Ms. Grieves had some problems with concentration and pace, but not to a degree to be more

---

[24] Although the ALJ's hypothetical was not flawed, it does not cure the other flaws the ALJ made regarding Ms. Jones's credibility and discounting Dr. Jones's opinion.

than moderately limiting. *See* R. 297-303 and 335-337. The ALJ's questioning of the VE revealed that the ALJ took into consideration Ms. Grieves' concentration and pace problems due to her mental illness when formulating his RFC. (R. 572). Because substantial evidence supported his conclusion, this aspect of the ALJ's RFC should not be disturbed.

Ms. Grieves relies on *Young v. Barnhart*, 362 F.3d 995 (7th Cir. 2004) for the proposition that the ALJ cannot translate a mental limitation into a vocational conclusion. (Pl. Mem. at 26). However, *Young* does not stand for that proposition. The court in *Young* found that the ALJ's question to the VE was flawed because the ALJ did not include certain functional limitations in his RFC and his hypothetical question did not contain them. *Id.* at 1002-03. That is not the Plaintiff's argument in this case. The ALJ included Ms. Grieves' mental limitations in his RFC and stated them in his question to the VE. (R. 572). The ALJ did not omit some of her mental limitations as the ALJ did in *Young*.

Lastly, the ALJ's finding that Ms. Grieves would not experience further deterioration or decompensation was not pure speculation. The record did not reveal any past episodes of decompensation. In fact, Dr. Jones reported that Ms. Grieves has not experienced any repeated episodes of decompensation. (R. 302). Dr. Jones also stated that Ms. Grieves does not have a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation or ability to do basic work activities. (R. 302). Consequently, the ALJ did not "play doctor" as Plaintiff contends.

## CONCLUSION

This is a close case. Part of the ALJ's assessment was clearly right and it may well be that his assessment of Ms. Grieves' credibility was insightful. There are things in the record that bear upon that credibility and that had they been critically and accurately assessed – some

apparently did not even play into the ALJ's evaluation – the result of this case might have been different. But just as it is not for the government to supply supportive reasons that the ALJ may not have considered, neither is it for a reviewing court to do so. These are all matters for the ALJ's informed consideration on remand. The Commissioner's motion to affirm the decision is denied. This case is remanded to the Commissioner for further proceedings consistent with this decision.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 7/11/08